

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

**NOS. PD-0906-09, PD-0907-09, PD-0908-09, and PD-0909-09**

**EDUARDO VALTIERRA & HERIBERTO VALTIERRA, Appellants**

**v.**

**THE STATE OF TEXAS**

**ON STATE'S PETITION FOR DISCRETIONARY REVIEW
FROM THE FOURTH COURT OF APPEALS
KENDALL COUNTY**

**COCHRAN, J., delivered the opinion of the unanimous Court.**

**OPINION**

This appeal concerns the scope of a consent to search under the Fourth Amendment. Both the trial court and the court of appeals agreed that Heriberto Valtierra consented to have police officers enter his apartment to talk to Erica, a 13-year-old runaway. The question before us is whether, viewed in the light most favorable to the trial court's ruling, the evidence is sufficient to show that the scope of Heriberto's consent extended to the officer's act of walking down the open hallway to knock on the bathroom door where Erica was said

to be taking a shower.  The trial court upheld the officer's actions, but on the basis of a "protective sweep" or "exigent circumstances."  The Fourth Court of Appeals found that the officer did not have consent to walk down the hallway, nor were there exigent circumstances warranting a protective sweep.[1]  Because the record supports implied, if not explicit, consent to walk some twenty feet to the bathroom door, we conclude that the officer's actions were reasonable and within the scope of the original consent to enter and investigate Erica's whereabouts.  We therefore reverse the court of appeals's judgment and remand these cases for further proceedings.

## I.

Appellants, brothers Eduardo and Heriberto Valtierra, were each charged with possession of methamphetamine and cocaine.  They filed a motion to suppress, and the trial judge conducted a hearing, at which the following evidence was offered.

Boerne Police Officers Moncada and Rutledge received information about a possible female runaway at an apartment on South Plant Street in Boerne.  Officer Moncada recognized the address because he had been sent there the week before on a domestic violence call and had spoken to a man and a young girl named Erica.  The two officers went to the apartment and knocked on the door.

Heriberto Valtierra answered the door, and he and Officer Moncada talked in Spanish.

---

[1] *Eduardo Valtierra v. State*, 293 S.W.3d 725 (Tex. App.—San Antonio 2009); and *Heriberto Valtierra v. State*, 293 S.W.3d 697 (Tex. App.—San Antonio 2009).  Separate panels decided these cases and issued separate opinions.  Both opinions, however, contained the same reasoning and result.  We consolidated the two appeals for purposes of discretionary review.

Officer Moncada's body microphone recorded the exchange, although several portions of the recording are inaudible. According to the transcript of the recording, Moncada asked if he could come in, and Heriberto said, "Of course, but I was just heating tortillas." Both officers came into the apartment, and Moncada told him their purpose: "It's because we are looking for Erica. Where's Erica." Heriberto replied, "Over there. She's over there, inside," and he waved toward the bathroom.[2] Heriberto yelled out to her, "Erica, they're calling you." Moncada then asked if he could talk to her, and Heriberto said, "Yes, she'll come out in a minute."

At this point, a second man came out of a bedroom and walked into the living room where Officers Moncada and Rutledge were talking to Heriberto. The officers were surprised because they had thought that only Heriberto and Erica were in the apartment. That man said, "Let me close the door," but was told to sit on the couch. Moncada asked the second man where Erica was, and he also said, "She's inside, in the bathroom." While they were waiting, Moncada asked Heriberto how he knew Erica, and Heriberto said that she was his niece. Moncada expressed skepticism and said, "I am, I am thinking Erica is not, did not give me her real name. And you know it."

At this point, portions of the recording became inaudible. At the suppression hearing, Moncada testified that, when the girl did not come out of the bathroom, he asked Heriberto again where she was. Heriberto told him that Erica was taking a shower. Moncada was

---

[2] The trial judge specifically found that "[f]rom the front door, the officers could see the bathroom door."

suspicious because he didn't hear running water, so he asked Heriberto if he could go talk with her. Moncada testified that Heriberto said, "Yes," and, as he began walking toward the bathroom–a distance of approximately 20 feet, he saw two more men inside another bedroom. Moncada testified that when the men saw him, they immediately threw or "stuffed" something under the bed. Moncada called to Rutledge, and the two officers moved the men out of the bedroom and into the living room. One of those men was Eduardo Valtierra.

Moncada knocked several times on the bathroom door, and Erica finally came out. Meanwhile, Officer Rutledge conducted a protective sweep of the bedroom. Rutledge testified that, after noticing drug paraphernalia in plain view during the protective sweep, he called a sergeant. When Eduardo, the lessee of the apartment, declined to sign a consent-to-search form, Officers Moncada and Rutledge contacted an investigator to apply for a search warrant. When the warrant arrived, the officers found cocaine, methamphetamine, a stolen weapon, cash, and various drug paraphernalia.

Heriberto's testimony differed from Officer Moncada's in two respects.[3] First, Heriberto testified that Officer Moncada himself opened the front door and was already inside the apartment when he asked for permission to come in.[4] Second, Heriberto testified

---

[3] Heriberto admitted that he had lied to the officer about "Erica" being his niece.

[4] The sound of knocking is first heard on the recording, and, after that, Officer Moncada said, "What's up, cousin?" When Heriberto began to respond with "What's up my–," Moncada interrupted and said, "Police. May I talk to you, right now?" Heriberto said, "Of course." Moncada's next words were, "May I come in?" Heriberto responded, "Of course, but I was just

that Moncada did not specifically ask him if he could go down the hall, but asked him, "Can I go over there?" Heriberto "did not answer because [he] was warming up the tortillas." According to Heriberto, Moncada "just kept on talking to me and kept on walking towards the inside."

The trial judge denied the motion to suppress and made written findings of facts and conclusions of law supporting the officers' version of the events. Presumably as a result of his concern over the inaudible portions of the recording, the judge avoided the issue of consent to walk down the hall[5] and denied appellants' motion on an alternative basis: the officers legally discovered the contraband during a protective sweep.[6] After their motion to suppress was denied, Eduardo and Heriberto pled guilty to both possession of methamphetamine and possession of cocaine with intent to deliver. Both appealed the trial judge's suppression ruling.

---

heating tortillas."

[5] During Officer Moncada's testimony, the trial judge expressed concern that the tape recording did not reflect either that Moncada asked for permission to go down the hall to knock on the bathroom door or that Heriberto gave him explicit permission. The judge said that the inaudible portion did not last very long, and therefore he did not think that the recording supported Officer Moncada's testimony on this point. Later, Heriberto testified and stated that Moncada did ask for his consent to "go over there," but that he did not respond because he was still heating the tortillas.

[6] In his written findings, the trial judge found that Moncada received oral consent from Heriberto to enter the apartment, and he found that the officers searched the bedroom for "officer safety" and to secure the area. The trial judge also found that, once the officers saw an unknown person emerge from the back of the apartment, they were entitled to move across the living room and down the hallway to conduct a protective sweep for officer safety. Further, he found that, for her own protection, the officers were permitted to go down the hallway to contact the person thought to be a runaway.

The Fourth Court of Appeals reversed appellants' convictions, finding that the officers had consent to enter the apartment, but that the record did not support consent to go down the hallway.[7]  In Heriberto's case, the court of appeals declined to grant deference to any implied factual finding that Moncada had permission to proceed down the hallway.  Citing this Court's opinion in *Carmouche v. State*,[8] it reasoned that the tape recording did not support such a finding.[9]  In both cases, the court of appeals further found that neither a protective sweep nor exigent circumstances supported Officer Moncada's action, because the protective sweep was not conducted until after he had already walked down the hallway and seen the two men making furtive gestures.[10]  We granted review on four separate grounds, but we need address only the first two.[11]  Therefore, we dismiss grounds three and four.

---

[7] *Eduardo Valtierra*, 293 S.W.3d at 735 ("[T]he record does not provide clear and convincing evidence that Heriberto gave Officer Moncada permission to move across the living room and down the hallway."); *Heriberto Valtierra*, 293 S.W.3d at 703 ("[T]he record in this case does not support an implied finding that the State proved by clear and convincing evidence that Heriberto gave consent for Officer Moncada to proceed down the hallway toward the bathroom.").

[8] 10 S.W.3d 323, 332 (Tex. Crim. App. 2000) (declining to give "almost total deference" to trial court's implicit findings because "the videotape presents indisputable visual evidence contradicting the essential portions" of the arresting officer's testimony).

[9] *Heriberto Valtierra*, 293 S.W.3d at 702 (noting that, in *Carmouche,* "the Texas Court of Criminal Appeals declined to defer to a trial court's implied finding of consent.").

[10] *Eduardo Valtierra*, 293 S.W.3d at 732-33; *Heriberto Valtierra*, 293 S.W.3d at 703-04.

[11] The State's four grounds for review are as follows:
1.    After viewing the evidence in the light most favorable to the trial court's findings and conclusions, did the Honorable Court of Appeals err in finding that the officer did not have consent to walk down the apartment hallway to the location of the runaway child, when a resident of the apartment, Heriberto Valtierra, had just told the officer where the female runaway child was located and consented to the officer talking to her?

## II.

### A.    Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review.[12]  First, we afford almost total deference to a trial judge's determination of historical facts.[13]  The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.[14]  He is entitled to believe or disbelieve all or part of the witness's testimony–even if that testimony is uncontroverted–because he has the opportunity to observe the witness's demeanor and appearance.[15]

If the trial judge makes express findings of fact, we view the evidence in the light most favorable to his ruling and determine whether the evidence supports these factual

---

2.    Did the Honorable Court of Appeals fail to apply the proper standard of review pursuant to *Guzman v. State*, 955 S.W.2d 85 (Tex. Crim. App. 1997), in that the Court failed to consider all of the facts and circumstances shown to have been in the possession of the officers at the time of the incident?

3.    Did the Honorable Court of Appeals err in finding that the protective sweep conducted by law enforcement officers was not justified for safety of the officers or the child?

4.    Did exigent circumstances exist for law enforcement officers to proceed down a hallway toward a room where the runaway child was said to be located, given the fact that her status was that of a "runaway," and that adult males were seen in the residence with this 13 year old female, together with observations made of suspicious activities by one of the four adult males?

[12] *See Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[13] *See Guzman*, 955 S.W.2d at 89.

[14] *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

[15] *Id.*

findings.[16] When findings of fact are not entered, we "must view the evidence 'in the light most favorable to the trial court's ruling' and 'assume the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record.'"[17]

Second, we review a trial court's application of the law of search and seizure to the facts *de novo*.[18] We will sustain the trial court's ruling if that ruling is "reasonably supported by the record and is correct on any theory of law applicable to the case."[19]

## B.    The Scope of Consent Under the Fourth Amendment

The Fourth Amendment protects individuals against unreasonable searches and seizures.[20] "The touchstone of the Fourth Amendment is reasonableness."[21] We presume that a warrantless police entry into a person's home is unreasonable unless the entry falls within an exception to the warrant requirement.[22] Voluntary consent is one such exception.[23]

---

[16] *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006).

[17] *See Harrison v. State*, 205 S.W.3d 549, 552 (Tex. Crim. App. 2006) (quoting *Ross*, 32 S.W.3d at 855); *see also Kelly*, 204 S.W.3d at 819.

[18] *See Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007); *Kelly*, 204 S.W.3d at 818.

[19] *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

[20] U.S. CONST. amend. IV.

[21] *Jimeno v. Florida*, 500 U.S. 248, 250 (1991).

[22] *Johnson v. State*, 226 S.W.3d 439, 443 (Tex. Crim. App. 2007).

[23] *Id*.; *see United States v. Matlock*, 415 U.S. 164, 165-66 (1974) ("[T]he search of property, without a warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment.").

Although consent must be positive, it may be given orally or by action, or shown by circumstantial evidence.[24] The validity of an alleged consent to search is a question of fact to be determined from the totality of the circumstances.[25] Under Texas law, the State must prove voluntary consent by clear and convincing evidence.[26]

The entry into a residence by police officers is a "search" for purposes of the Fourth Amendment, but an owner's or occupant's voluntary consent makes that entry constitutionally "reasonable."[27] Consent to enter a residence does not, without more, provide consent for a police officer to search the entire residence or objects therein.[28] As the court of appeals aptly noted, "Once permitted into a residence, a police officer may take action only in accordance with the purpose for which he was invited or allowed into the

---

[24] *See Johnson*, 226 S.W.3d at 446 n.27 (actual consent may be shown by circumstantial evidence); *Gallups v. State*, 151 S.W.3d 196, 201 (Tex. Crim. App. 2004) (consent to enter home could be inferred from defendant's action of motioning officer to come forward); *Allridge v. State*, 850 S.W.2d 471, 493 (Tex. Crim. App. 1991) (consent to search "must be shown to be positive and unequivocal, and there must not be any duress or coercion").

[25] *Ohio v. Robinette*, 519 U.S. 33, 40 (1996); *Gallups*, 151 S.W.3d at 200-01; *Guevara v. State*, 97 S.W.3d 579, 582 (Tex. Crim. App. 2003); *Maxwell v. State,* 73 S.W.3d 278, 281 (Tex. Crim. App. 2002).

[26] *Reasor v. State*, 12 S.W.3d 813, 817 (Tex. Crim. App. 2000); *Meeks v. State*, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985).

[27] *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (the Fourth Amendment prohibition against the warrantless entry of a person's home does not apply when the police obtain the voluntary consent to enter from the owner or other person with common authority over the residence).

[28] *See Alberti v. State*, 495 S.W.2d 236, 237 (Tex. Crim. App. 1973); *LeBlanc v. State*, 424 S.W.2d 434, 436 (Tex. Crim. App. 1968).

residence."[29]  The Supreme Court has explained, and we have held, that "the standard for measuring the scope of consent under the Fourth Amendment is that of 'objective' reasonableness–what would the typical reasonable person have understood by the exchange between the officer and the suspect?"[30]  Of course, a person is free to limit the scope of the consent that he gives,[31] but a person's silence in the face of an officer's further actions may imply consent to that further action.[32]  Furthermore, "[i]f the consent to search is entirely

---

[29] *Heriberto Valtierra*, 293 S.W.3d at 702; *Eduardo Valtierra*, 293 S.W.3d at 731 (citing *Alberti*, 495 S.W.2d at 237; *LeBlanc*, 424 S.W.2d at 436); *see also Robertson v. State*, 375 S.W.2d 457, 458 (Tex. Crim. App. 1964) ("[A] waiver of constitutional immunity from unreasonable search and seizure could not be inferred from the acts of accused in admitting police officers into his apartment in compliance with their request for an interview"; officers improperly searched apartment, including desk drawer and a trash sack).

[30] *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *Johnson v. State*, 226 S.W.3d 439, 443 (Tex. Crim. App. 2007).  In *Johnson*, we quoted from *State v. Koucoules,* 343 A.2d 860, 868 (Me. 1974), concerning the proper scope of a consensual search:
> A consent search is a limited and conditional search only insofar as the consenting party has expressly stated, or, under the reasonable man standard in the light of all the existing circumstances, is deemed in fact to have impliedly attached, certain limitations under which the officers are authorized by him to search. The character of the search is determined by the scope of the authorization as understood by reasonable men having knowledge of all the existing factual circumstances, and not by any limitational rule of law applicable to all consent searches.

*Johnson*, 226 S.W.3d at 446 n.30.

[31] *Jimeno*, 500 U.S. at 252 ("A suspect may of course delimit as he chooses the scope of the search to which he consents."); *see also Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999) ("Although a premises search conducted pursuant to valid consent cannot violate the Fourth Amendment, the consenting party may limit the scope of that search, and hence at any moment may retract his consent.") (internal citation omitted).

[32] *See, e.g., United States v. Stapleton*, 10 F.3d 582, 584 (8th Cir. 1993) (given suspect's silence when he was told of the object of the search, "it was objectively reasonable" for the officers to conclude that they had all the consent that was constitutionally required or that they had suspect's implied consent); *see generally, State v. Flippo*, 575 S.E.2d 170, 178-80 (W. Va. 2002) (discussing doctrine of implied consent to search a home and collecting numerous cases

open-ended, a reasonable person would have no cause to believe that the search will be limited in some way."[33]

III.

In this case, the question is whether Officer Moncada had consent to walk some twenty feet down the apartment hallway to the bathroom door after Heriberto had said that Erica was taking a shower.  The court of appeals found that he did not have consent to do so because the issue was "hotly contested" at the hearing, the body-microphone recording was inaudible at that point,[34] and the trial judge did not make an explicit factual finding on that matter.[35]  Despite the lack of an explicit factual finding, we still must view the totality of the facts in the light most favorable to the trial court's ultimate ruling.[36]

First, Officer Moncada testified that he asked Heriberto if he could go down the hallway and, after listening to the tape recording, said that he could hear the Spanish word

---

from various jurisdictions and concluding that "consent to search may be implied by the circumstances surrounding the search, by the person's prior actions or agreements, or by the person's failure to object to the search.  Thus, a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'").

[33] *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 670 (5th Cir. 2003).

[34] In Heriberto's case, the court of appeals relied upon our opinion in *Carmouche* for the proposition that, when an audio or visual tape recording directly contradicts a witness's testimony, appellate courts may decline to defer to a trial judge's implicit finding that the witness's testimony is accurate.  *Heriberto Valtierra*, 293 S.W.3d at 703 (quoting *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000)).  But in the present case, the tape recording does not contradict Officer Moncada's testimony; it is simply inaudible and therefore does not affirmatively support his testimony.

[35] *See Heriberto Valtierra*, 293 S.W.3d at 703; *Eduardo Valtierra*, 293 S.W.3d at 731.

[36] *Guzman*, 955 S.W.2d at 89.

"puedo"– meaning "may I" or "can I"–on the recording.  He also testified that Heriberto said

"Yes."  Heriberto agreed that Officer Moncada asked him if he could "go over there," but

that he did not answer because he was heating the tortillas.  Heriberto never testified or even

suggested that he said that the officer could not or should not go knock on the bathroom door,

that he did not want the officer to do so, or that he would have refused consent if asked.

The problem in this case may be that neither the trial judge nor the court of appeals

sufficiently considered the scope of the consent given to Officer Moncada by Heriberto.  The

court of appeals correctly noted our prior opinions in *Alberti* and *LeBlanc* stating that, when

an officer is invited into a residence, that is not an invitation to search the entire house.[37]

But those cases do not deal with the scope of a consensual entry and search.

In *Florida v. Jimeno*,[38] the Supreme Court explained that "[t]he scope of a search is

generally defined by its expressed object."[39]  In that case, Mr. Jimeno gave the investigating

officer permission to search his car, knowing that the officer was looking for drugs, and he

"did not place any explicit limitation on the scope of the search."[40]  Thus, it was "objectively

reasonable for the police to conclude that the general consent to search [Jimeno's] car

---

[37] *See Alberti v. State,* 495 S.W.2d 236, 237 (Tex. Crim. App. 1973); *LeBlanc v. State*, 424 S.W.2d 434, 436 (Tex. Crim. App. 1968).

[38] 500 U.S. 248 (1991).

[39] *Id.* at 251.

[40] *Id.*

included consent to search containers within that car which might bear drugs."[41]  The Supreme Court carefully noted that a person may expressly limit the scope of his consent to search, "[b]ut if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization."[42]  The same is true when dealing with the entry into and search of a house. If an officer is invited or permitted to come into a house for a particular purpose (such as to look for a particular person or object), the scope of the consent to enter normally includes consent to search those areas in which the person or object would reasonably be found.[43]  But the person who consents to the entry may specifically limit or revoke his consent.

In the present case, the court of appeals correctly stated that, "[o]nce permitted into a residence, a police officer may only take action in accordance with the purpose in which he was invited or allowed into the residence."[44]  But the court of appeals did not go further and apply *Jimeno*'s "scope of consent" reasoning to the particular situation.[45]  The purpose

---

[41] *Id.*

[42] *Id.* at 252.

[43] *See, e.g., United States v. Mains*, 33 F.3d 1222, 1227 (10th Cir. 1994) (consent to enter apartment and look for parolee included, within its scope, officers' action of looking further than the living room into "any area in the apartment large enough to accommodate" the person they were seeking, including a bedroom walk-in closet).

[44] *Heriberto Valtierra*, 293 S.W.3d at 702; *Eduardo Valtierra*, 293 S.W.3d at 731.

[45] Courts may "look beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous police statements and actions." *United States v. Turner*, 169 F.3d 84, 87 (1st Cir. 1999) (discussing scope of consent under *Jimeno*).

of Officers Moncada and Rutledge in going to the Valtierra brothers' apartment was to look for Erica whom they thought was the runaway girl. Moncada told Heriberto that this was their purpose. Heriberto was friendly and fully cooperative. He invited the officers in and said that Erica was there. He told Moncada that she was "over there" in the bathroom. He agreed that Moncada could talk to her, and he yelled out to Erica, "They're calling you." The hallway and bathroom door were visible from the living room where Moncada was standing. Both Moncada and Heriberto testified that Moncada asked if he could go "over there" or down to the bathroom door; they differ only on whether Heriberto expressly said, "Yes."[46] No one testified that Heriberto said, "No," or indicated in any manner that Moncada should not walk down the hall to knock on the bathroom door. Heriberto placed no limits or conditions upon the officers' entry, nor did he attempt to confine their presence to any particular area of the apartment.[47] Officer Moncada simply walked down the open hallway to the bathroom door, a path that was fully visible from his original location in the living

---

[46] *See United States v. Wesela*, 223 F.3d 656, 661 (7th Cir. 2000) (woman who called officers and consented to their entry into her apartment to arrest her husband consented to the search for her husband and gun, even though there was "no direct verbal exchange" in which she expressly consented to the search as "events indicate[d] her implicit consent"; "[d]ue to the proximity of the rooms, [she] was probably aware of what was going on in her bedroom and elsewhere in the apartment. Had she wished to do so, she could have objected to [the detective's] search.").

[47] *See id*; *see also United States v. Gould*, 364 F.3d 578, 588-89 (5th Cir. 2004) (officers told mobile home occupant that they were looking for a specific person; occupant said he was there, probably asleep in the bedroom, and invited them in to "check it out"; officers went to master bedroom, found no one, opened closet door and found guns; holding that officers had consent to go inside and search, but not into that person's private bedroom; nonetheless, upholding discovery of guns as they were found during a legitimate "protective sweep").

room.  It was only as he passed by the open bedroom door on his way to knock on the bathroom door, that he saw Eduardo and another man making furtive gestures.

Given the totality of these factual circumstances,[48] and viewing them in the light most favorable to the trial judge's ultimate ruling,[49] the legal question is, what would "the typical reasonable person have understood by the exchange between the officer and the suspect?"[50] We think that it was objectively reasonable for Officer Moncada to conclude that Heriberto's general consent to come inside the apartment to find and talk to Erica included consent to walk down the open hallway to knock on the bathroom door.[51]

Although the trial judge did not make an express finding concerning the scope of Heriberto's consent, he did find that "Officer Moncada received oral consent to enter the apartment from Heriberto Valtierra."  Thus, we defer to the trial judge's ultimate position that Officer Moncada was lawfully present in the hallway when he observed the two men in

---

[48] *See United States v. Wesela,* 223 F.3d at 661 ("[W]hether a search was within the boundaries of consent is determined according to the 'totality of all the circumstances.'") (quoting *United States v. Torres*, 32 F.3d 225, 230-31 (7th Cir. 1994)).

[49] *See State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008) ("[T]he party that prevailed in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.").

[50] *Jimeno*, 500 U.S. at 251; *see United States v. Ibarra*, 965 F.2d 1354, 1357 (5th Cir. 1992) (under *Jimeno*, "the question of objective reasonableness is a question of law, [but] the factual circumstances surrounding the consent are central to determining the nature of the consent and how it would have been understood by a reasonable person.").

[51] *See Jimeno*, 500 U.S. at 251; *see also United States v. Saadeh*, 61 F.3d 510, 518 (7th Cir. 1995) (under *Jimeno*, consent to search mini-warehouse for money, narcotics, and guns included, within its scope, search of desk and toolbox when consenting person "did not put any express limitation on the scope of her consent.").

the bedroom making furtive gestures and throwing items under the bed.  That finding does not end the Fourth Amendment inquiry, however, because the entry into the bedroom and the discovery of drug paraphernalia depend upon the legitimacy of the "protective sweep" that Officer Rutledge made after Officer Moncada saw the two men making "furtive gestures."[52] Although the court of appeals was correct in concluding that a "protective sweep" did not provide the basis for Officer Moncada's walk down the hallway, it has not examined the Fourth Amendment reasonableness of the officers' actions after Officer Moncada saw the furtive gestures.

We therefore reverse the judgments of the court of appeals and remand these cases to that court for further proceedings consistent with this opinion.

Delivered: May 5, 2010

Publish

---

[52] *See Gould*, 364 F.3d at 589-91 (discussing "protective sweep" of bedroom based on reasonable suspicion after officers had obtained consent to enter mobile home to look for a specific person).